UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| F.G., et al.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>COOPERSURGICAL, INC., et al.,<br><br>　　　　　Defendants. | Case No. 24-cv-01261-JST<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PROTECTIVE ORDER IN PART**<br><br>Re: ECF No. 8 |

Before the Court is Plaintiffs' motion for a protective order. ECF No. 8. The Court will grant the motion in part and deny it in part.

**I.　BACKGROUND**

　　**A.　Defendants CooperSurgical, Inc. and The Cooper Companies**

Defendants CooperSurgical, Inc. ("CooperSurgical") and The Cooper Companies, Inc. ("TCC") "manufacture, market, and sell products to fertility clinics, including a culture media product designed to support the growth and development of embryos created through [in vitro fertilization]." ECF No. 1 ¶ 2.[1] "The culture media is a nutrient-rich liquid that surrounds a fertilized egg during the incubation period to help it develop into a viable embryo as part of the IVF process." *Id.*

"In December 2023, CooperSurgical recalled certain lots of its culture media products[.]" *Id.* ¶ 3. The recall notice stated, in part, that "CooperSurgical [had] become aware of a sudden increase in complaints regarding the aforementioned lots of this product," and acknowledged that the "risk to health is impaired embryo development prior to the blastocyst stage." *Id.* ¶ 46.

---

[1] CooperSurgical is "a wholly owned subsidiary" of TCC. ECF No. 1 ¶ 17.

"According to regulatory authorities, CooperSurgical issued the recalls because the recalled batches of the Global Media were deficient in magnesium . . . a critical component and essential element of embryo culture media[.]" *Id.* ¶ 47. "The FDA posted a notice on its website regarding the recall in February 2024, estimating that 994 bottles of culture media were affected, 481 of which were purchased by clinics across the United States." *Id.* ¶ 51.[2]

### B. Plaintiffs F.G. and H.I.

"Plaintiffs F.G. and H.I. are a married couple that sought IVF treatment at a fertility clinic in New York" in the hopes of having biological children. *Id.* ¶ 4. Plaintiffs bring this action on behalf of themselves and on behalf of a class of "individuals in the United States whose eggs and/or embryos were exposed" to recalled lots of Defendants' product. *Id.* ¶ 59.

"On or around November 2023, Plaintiffs' fertility clinic fertilized four of F.G.'s eggs with H.I.'s sperm and placed them in Defendants' culture media." *Id.* ¶ 55. Plaintiffs allege that "[e]ach of the four eggs was successfully fertilized, but all of Plaintiffs' developing embryos were destroyed due to Defendants' defective culture media." *Id.* ¶ 56. In February 2024, "F.G and H.I. were notified . . . that all of their embryos were exposed to the defective culture media, which was subject to a recall." *Id.* ¶ 57. Plaintiffs aver that "[t]he embryos that [they] lost are irreplaceable" because "F.G. is older now than she was at the time the eggs used to create the lost embryos were retrieved." *Id.* ¶ 58. As a result, Plaintiffs contend that "even if [they] are able to create additional embryos—a physically, emotionally, and financially costly procedure that is by no means guaranteed to succeed—those embryos made with older eggs would not have as high of a chance of successfully developing into a healthy child or children." *Id.*

Plaintiffs filed this putative class action against Defendants on March 1, 2024, alleging, *inter alia*, strict products liability (manufacturing defect, design defect, and failure to warn), negligent failure to recall, negligence or gross negligence, trespass to chattels, and unjust enrichment. ECF No. 1. Including the present case, there are at least 21 cases pending before the undersigned making similar claims against Defendants.

---

[2] The FDA recall notice can be found at: https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfres/res.cfm?id=205122.

### C. CooperSurgical's Contacts with Putative Class Members

Since January 13, 2024, CooperSurgical has been contacting affected patients through a settlement program that it calls the "Fertility Patient Program." ECF No. 30 at 7. The communications to affected patients, which are conducted through third-party clinics, indicate that "a lot of global culture media from CooperSurgical" was recalled and that "embryos from your IVF case . . . were exposed to the recalled media." ECF No. 8-3 at 2. In addition, the communications state that, in order to reach a resolution, the patient must execute a "HIPAA release" to share "cycle and contact information with CooperSurgical." *Id.* Although the communications have continued since the filing of this putative class action, there is no evidence that CooperSurgical has advised patients of the existence of the litigation. *See* ECF No. 8-7 at 2; ECF No. 32-2 at 2. Plaintiffs now bring this motion for a protective order seeking to prevent Defendants from communicating with putative class members. ECF No. 8. Plaintiffs request that the Court "invalidate any releases or settlements the Defendants have procured," "prohibit Defendants from communicating with class members," and "furnish Plaintiffs' counsel with the names of all class members they have contacted directly." *Id.* at 9–10. They also ask the Court to order Defendants to distribute a corrective notice. *Id.* at 10–11.

## II. JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1332.

## III. LEGAL STANDARD

"Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981).[3] "The prophylactic power accorded to the court presiding over a putative class action under Rule 23(d) is broad; the purpose of Rule 23(d)'s conferral of authority is not only to protect class members in particular but to safeguard generally the administering of justice and the integrity of the class

---

[3] "Although *Gulf Oil* concerned communications between counsel for the named plaintiff and potential class members, its rationale has been found to apply to communications between defendants and potential class members as well." *Westerfield v. Quizno's Franchise Co., LLC*, No. 06-C-1210, 2007 WL 1062200, at *3 (E.D. Wis. Apr. 6, 2007).

1    certification process." *O'Connor v. Uber Technologies, Inc.*, No. C-13-3826 EMC, 2014 WL
2    1760314, at *3 (N.D. Cal. May 2, 2014).

3         *Gulf Oil* mandates that "an order limiting communications between parties and potential
4    class members should be based on a clear record and specific findings that reflect a weighing of
5    the need for a limitation and the potential interference with the rights of the parties." 452 U.S. at
6    101. "[S]uch a weighing—identifying the potential abuses being addressed—should result in a
7    carefully drawn order that limits speech as little as possible, consistent with the rights of the
8    parties under the circumstances." *Id*. at 102. An order under *Gulf Oil* "does not require a finding
9    of actual misconduct"—rather, "[t]he key is whether there is 'potential interference' with the
10   rights of the parties in a class action." *O'Connor v. Uber Technologies, Inc.*, No. C-13-3826
11   EMC, 2013 WL 6407583 at *4–5 (N.D. Cal. Dec. 6, 2013).

12        Rule 23(d) does not prohibit offers of settlement to putative class members, but courts may
13   limit communications that improperly encourage potential class members to not join the suit,
14   especially if they fail to provide adequate information about the pending class action. *See*
15   *O'Connor*, 2014 WL 1760314, at *6–7. The best notice will "contain an adequate description of
16   the proceedings written in objective, neutral terms, that, insofar as possible, may be understood by
17   the average absentee class member." *In re Nissan Motor Corp. Antitrust Litigation*, 552 F.2d
18   1088, 1104 (5th Cir. 1977).

19        Courts in this district have limited communications, as well as invalidated agreements that
20   resulted from those communications, when they omitted critical information or were otherwise
21   misleading or coercive. *See, e.g.*, *O'Connor*, 2013 WL 6407583, at *6 (invalidating arbitration
22   agreements that "shrouded" a class action waiver within one of many provisions in a Licensing
23   Agreement); *County of Santa Clara v. Astra USA, Inc.*, No. 05-3740 WHA, 2010 WL 2724512, at
24   *4 (N.D. Cal. July 8, 2010) (invalidating releases obtained by letter to putative class that did not
25   attach plaintiffs' complaint, explain plaintiffs' claims or the status of the case, or include contact
26   information for plaintiffs' counsel); *Camp v. Alexander*, 300 F.R.D. 617, 621, 624 (N.D. Cal.
27   2014) (invalidating opt-outs obtained by letter to employees of defendants stating the class action
28   was "motivated by greed" and "could result in the closure" of the business, and failed to include

1  any explanation of plaintiffs' claims, a copy of the complaint, or contact information for plaintiffs'
2  counsel).
3  Other courts throughout the country have also restricted communications or invalidated
4  releases when the communications suffered from similar deficiencies.  *See, e.g., Friedman v.*
5  *Intervet Inc.*, 730 F. Supp. 2d 758, 764 (N.D. Ohio 2010) (defendant obtained settlement releases
6  without informing class members they were giving up the right to participate in putative class
7  action); *In re Currency Conversion Fee Antitrust Litigation*, 361 F. Supp. 2d 237, 251 (S.D.N.Y.
8  2005) (defendant did not inform class members that they were "forfeiting their rights as potential
9  plaintiffs" in the pending class action).

**IV.  DISCUSSION**

11  CooperSurgical does not dispute that, "[a]s part of its response to [the product] recall," it
12  prophylactically developed a settlement program, called the Fertility Patient Program, to reach out
13  to affected patients and provide reimbursement for any failed IVF cycles.  ECF No. 30 at 7.
14  In response to Plaintiffs' motion for a protective order, CooperSurgical argues that:  (1) the
15  Court should decide whether this action is properly considered a putative class action before
16  deciding whether Plaintiffs may invoke Rule 23(d); (2) a summons has not yet issued, and
17  personal jurisdiction and venue are lacking; and (3) Plaintiffs' motion fails to establish the
18  requisite "clear record" to support the extraordinary relief sought.  *Id.* at 12–14.  TCC "joins
19  CooperSurgical's" various arguments, *see* ECF No. 29 at 3–4, and additionally contends that it
20  "had no involvement in the facts underlying Plaintiffs' claims, nor in the Fertility Patient Program
21  at issue in Plaintiffs' motion."  *Id.* at 4.

**A.  Class Certification**

23  Beginning with class certification, Defendants argue that Plaintiffs inappropriately invoke
24  "Rule 23 offensively," ECF No. 30 at 14, because "personal injury claims are generally
25  inappropriate for class treatment," *id.* (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625
26  (1997)); *see* ECF No. 29 at 8.  In Defendants' view, this puts the remedies available under Rule
27  23(d) out of Plaintiffs' reach.
28  Defendants are correct that the Supreme Court has cautioned that personal injury claims

1    may not be suitable for class certification because they "present 'significant questions, not only of
2    damages but of liability and defenses of liability . . . affecting the [individual class members] in
3    different ways.'" *Amchem Prods., Inc*, 521 U.S. at 625 (quoting Fed. R. Civ. P. 23 advisory
4    committee's note to 1966 amendment). Nonetheless, it is well-established that a Rule 23(d)
5    protective order can precede class certification. *See Mevorah v. Wells Fargo Home Mortg.*, 2005
6    WL 4813532, at *3 (N.D. Cal. Dec. 7, 2005) (citing *Gulf Oil*, 452 U.S. at 101) ("Pre-certification
7    communications to potential class members by both parties are generally permitted, and also
8    considered to constitute constitutionally protected speech.").

### B.    Summons, Personal Jurisdiction, and Venue

Next, the Court addresses Defendants' arguments that a summons must issue before the Court can resolve this order, and that the Court lacks personal jurisdiction and venue over this action. *See* ECF Nos. 29 at 7–8, 30 at 18–21.

First, the arguments concerning the lack of summons are now moot because a summons has issued, and Defendants have been served. *See* ECF Nos. 44, 50, 51.

Second, the Court need not decide questions of jurisdiction and venue prior to resolving the present motion for a protective order. "Jurisdiction is vital only if the court proposes to issue a judgment on the merits." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (internal quotations and alteration omitted); *see In re Zyprexa Prod. Liab. Litig.*, 594 F.3d 113, 126 (2d Cir. 2010) ("a federal court has jurisdiction to determine its own jurisdiction. While it must make this determination before it reaches the merits of the case before it, it is empowered to issue non-dispositive orders between the filing of the action and its ultimate determination on the merits.") (Kaplan, J., concurring). In deciding this motion for a protective order, the Court is not issuing a decision on the merits. *See Stewart v. Johnson*, No. CV 5:18-037, 2021 WL 6752312, at *1 (S.D. Ga. Aug. 10, 2021) ("dispositive motions are those that dispose of cases summarily as a matter of law"); 28 U.S.C. § 636(b)(1)(A) (listing examples of dispositive motions).

Thus, while Defendants may be correct that "there are serious questions" regarding personal jurisdiction, venue, and the viability of class certification, the Court need not resolve

those disputes now.  ECF No. 30 at 26.

## C. Protective Order

Having addressed the threshold issues, the Court turns to the merits of Plaintiffs' request that the Court enter a protective order.  As noted above, "an order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Gulf Oil*, 452 U.S. at 101.  Courts in this district have limited communications, and sometimes invalidated agreements that resulted from those communications, when they omitted critical information or were otherwise misleading or coercive. *See, e.g.*, *O'Connor*, 2013 WL 6407583, at *6.

### 1. Clear Record and Specific Findings

Although the Court does not find that CooperSurgical's communications with class members are coercive, it does conclude that there is a clear record that at least some of CooperSurgical's communications are misleading.

Plaintiffs aver that CooperSurgical's communications are coercive because they impose an "arbitrary six-month deadline for patients to act on the offer for 'reimbursement.'" ECF No. 8 at 7.  They also contend that because CooperSurgical's offer states that "[t]o reach a resolution for you, we will need your HIPAA release," this "suggest[s] that Defendants' offer is the only possible compensation available." *Id*.  In regard to the six-month deadline, Plaintiffs are correct that "class members are up against their biological clocks and any delay increases risk of failure of unsafe pregnancy." ECF No. 32 at 6.  But that pressure is inherent in class members' circumstances and is not a function of Defendants' deadline.  Plaintiffs do not provide, and the Court is unable to find, any case authority that supports their position that a six-month deadline is inherently coercive.  Indeed, one court in this district held that "a deadline of 11 days . . . for accepting the settlement offer" was insufficient to "warrant judicial intervention" under Rule 23(d).  *Goldthorpe v. Cathay Pac. Airways Ltd.*, No. 17-CV-03233-VC, 2023 WL 9181466, at *1 (N.D. Cal. Dec. 7, 2023).  And further, while the Court finds that CooperSurgical's HIPAA-release language could have been more specific, any resulting confusion was not so great as to

7

1   create an inference that putative class members were coerced into signing a release.  Nor were
2   CooperSurgical's communications prior to March 1, 2024 misleading.  Prior to that date, no
3   putative class action was on file, and there was accordingly no need to notify putative class
4   members of the existence of one.
5         However, although CooperSurgical's communications are not coercive, since March 1,
6   2024 they have been misleading and create "a potential for unknowing waivers resulting from a
7   lack of information."  *Westerfield*, 2007 WL 1062200, at *3.  It does not appear that
8   CooperSurgical is providing notice of the pending class action.  Indeed, CooperSurgical
9   acknowledges as much in its opposition, arguing that Plaintiffs "provide no authority to support
10  that CooperSurgical is required—for a communication to absent putative class members not to be
11  misleading—to notify them of a patently deficient and unserved class action."  ECF No. 30 at 26.
12  Caselaw is clear that omitting mention of a pending class action—even an uncertified one—can be
13  misleading.  *See Friedman*, 730 F. Supp. 2d at 765–66 (providing notice of uncertified action was
14  necessary even considering "steep hill plaintiff" faced to establish class certification); *In re*
15  *Currency Conversion Fee Antitrust Litigation*, 361 F. Supp. 2d at 251 (defendant did not inform
16  class members of pending class action); *Westerfield*, 2007 WL 1062200, at *3 (determining that
17  failure to mention the pending class action was misleading because "a risk exists that franchisees
18  might sign the release without knowing what they are releasing."); *cf. Eshelman v. OrthoClear*
19  *Holdings, Inc.*, No. C 07-01429 JSW, 2007 WL 2572349, at *3 (N.D. Cal. Sept. 4, 2007) (no
20  corrective action was necessary when the offers for settlement (1) apprised the putative class about
21  the pending lawsuit, (2) contained contact information for the plaintiffs' counsel, and (3) included
22  the second amended complaint).  "When a defendant in a proposed class action communicates
23  with potential class members about the case, the defendant is under the highest obligation to do so
24  . . . *without omitting information* that would be important for the proposed class members to
25  consider, and without a hint of coercion."  *Goldthorpe*, 2023 WL 9181466, at *1 (emphasis
26  added).  But that is what CooperSurgical is doing—contacting putative class members without
27  informing them of the existence of the litigation.  Those communications are misleading.  That
28  Defendants think Plaintiffs' case is "patently deficient" is of no moment.  ECF No. 30 at 26.

### 2. Scope of Remedies

Having concluded that Defendants' communications were and are misleading, the Court turns to the question of remedies. Plaintiffs ask the Court to order "Defendants (and any of their agents) [to] immediately cease and desist contact with class members or their physicians regarding any request for a release that arises out of the subject matter of this litigation and/or any agreement that waives a class member's rights to recovery in this litigation." ECF No. 8 at 3. They assert that Defendants should be precluded from using the improperly obtained releases, and request that a Court-approved corrective notice is distributed to all putative class members Defendants contacted. *Id.* Defendants, on the other hand, ask the Court to take no action and argue there is no basis to void any of the releases already obtained. ECF Nos. 29 at 8, 30 at 27–28.

In determining the appropriate remedies, the Court remains guided by *Gulf Oil*'s caution to impose a "carefully drawn order," 452 U.S. at 102, as well as remedies imposed by colleague courts around the country. *See Kirby v. Kindred Healthcare Operating, LLC*, No. 5:19-CV-00833-JLS(DFM), 2020 WL 4639493, at *6 (C.D. Cal. May 1, 2020); *Bublitz v. E.I. duPont de Nemours & Co.*, 196 F.R.D. 545, 550 (S.D. Iowa 2000); *Friedman*, 730 F. Supp. 2d at 765–68. Having "weigh[ed] the need for a limitation and the potential interference with the rights of the parties," *Gulf Oil*, 452 U.S. at 101, the Court imposes the following remedies:

1. By June 3, 2024, CooperSurgical shall produce a list of persons with whom it has communicated regarding settlement or release on or after March 1, 2024 to Plaintiffs, even if such communications began prior to that date. Such list shall include the individuals with whom it attempted to communicate through third parties, even if the individuals in question did not thereafter communicate with CooperSurgical. The production of such information shall be subject to a qualifying protective order.[4]

---

[4] "HIPAA typically prevents a covered entity from disclosing PHI without first providing the patient with notice and an opportunity to object to the disclosure. *See* 45 C.F.R. § 164.512. A covered entity may nevertheless disclose PHI without prior notice in discovery where a qualifying protective order is in place. *See, e.g., Ehrlich v. Union Pac. R.R. Co.*, 302 F.R.D. 620, 628 (D. Kan. 2014); *In re Nat'l Hockey League Players' Concussion Injury Litig*, 120 F. Supp. 3d 942, 953 (D. Minn. 2015); 45 C.F.R. § 164.512(e)(1)(ii)(B), (e)(1)(v). A protective order satisfies HIPAA's requirements if it (1) prohibits the parties from using or disclosing the PHI for any purpose other than the litigation for which the information was requested and (2) requires the

2. Regarding any putative class member with whom Defendants communicated on or after March 1, 2024, who had not executed a release on or before that date, CooperSurgical shall send a corrective disclosure in a form approved by the Court, and shall file a declaration under penalty of perjury by a responsible employee of CooperSurgical that its obligations under this paragraph have been satisfied. Such disclosure shall be sent by first class mail and email. The declaration shall be filed by June 14, 2024. If the putative class member, CooperSurgical, or any entity acting on CooperSurgical's behalf previously used another method of communication, e.g., text, such corrective notice shall also be sent by that method. If any communications were in a language other than English, all corrective communications shall be in that language as well as in English.

3. The parties are ordered to meet and confer to decide on appropriate language for the curative notice, which the parties must submit to the Court for approval within 14 days of the date of this order. If the parties submit competing proposals, the Court will endeavor to choose, in all respects, the single proposal it concludes is most reasonable. *See* Michael Carrell & Richard Bales, *Considering Final Offer Arbitration to Resolve Public Sector Impasses in Times of Concession Bargaining*, 28 Ohio St. J. on Disp. Resol. 1, 20 (2013) ("In baseball arbitration . . . the parties . . . have every incentive to make a reasonable proposal to the arbitrator because the arbitrator will choose the more reasonable offer.").

4. "The curative notice must remedy the deficiencies identified herein and 'ensure that potential class members receive accurate and impartial information regarding the status, purposes and effects of the class action.'" *Kirby v. Kindred Healthcare Operating, LLC*, No. 519CV00833JLSDFM, 2020 WL 4639493, at *6 (C.D. Cal. May 1, 2020) (quoting *O'Connor v. Uber Techs., Inc.*, No. C-13-3826 EMC, 2014 WL 1760314, at *8 (N.D. Cal. May 2, 2014) (emphasis and internal citations omitted)). "For instance, the notice must include a copy of the operative complaint and Plaintiffs' counsel's name and contact information. The curative notice

---

return or destruction of the PHI at the conclusion of the litigation. 45 C.F.R. § 164.512(e)(1)(v); *In re Nat'l Hockey League*, 120 F. Supp. 3d at 953." *Washington v. Alderwood Surgical Ctr., LLC*, No. C22-1835-RSM, 2023 WL 6461145, at *3 (W.D. Wash. Oct. 4, 2023).

10

must also indicate that any settling putative class member may void the agreement in the manner described below." *Id.* The notice must also indicate that a settling putative class member may wish to consult with an attorney regarding their signed release.

5. If the Court later orders, or the parties voluntarily agree to, the disclosure to Plaintiffs' counsel of information regarding putative class members, including without limitation their identities or contact information (i.e., a "class list"), CooperSurgical shall provide information regarding all such persons regardless of whether they executed a release on or before March 1, 2024, and shall also indicate whether CooperSurgical or its affiliates contend that any such persons have released their claims.

6. Because Defendants' communications with putative class members on and after March 1, 2024, were misleading, releases executed on or after that date are voidable at the election of each settling putative class member. Settling putative class members may elect to void an individual settlement agreement at any time through the end of the opt-out period, should a class be certified, or as otherwise ordered by the Court. Any amount already paid pursuant to a later-voided agreement may be treated as an offset to any other recovery by the putative class member.

7. For any releases obtained after the filing of the class action complaint (March 1, 2024) but prior to the issuance of this order, CooperSurgical must issue a corrective disclosure apprising the putative class member that this action is currently pending and that the individuals may wish to consult with an attorney regarding their signed release. CooperSurgical must also include contact information for the Plaintiffs' counsel and a copy of the class action complaint. The curative notice must also indicate that any settling putative class member may void the agreement in the manner described above. The parties shall meet and confer, and make a proposal to the Court, regarding whether the language of this notice should be included in the disclosure required by Paragraph Two or should be sent as a separate notice.

8. As of May 20, 2024, Defendants are ordered to alert Plaintiffs, via email, of any *ex parte* communications with putative class members regarding the subject matter of this litigation within three days after such communications occur. Additionally, whenever Defendants communicate *ex parte* with putative class members regarding the subject matter of this litigation,

they must do so in writing and prominently include Plaintiffs' counsel's name and contact information and a copy of the complaint (if one has not previously been provided).

These remedies respect Defendants' First Amendment rights, *see Gulf Oil*, 452 U.S. at 104, while simultaneously mitigating the risk of "unknowing waivers" by putative class members "resulting from a lack of information." *Westerfield*, 2007 WL 1062200, at *3.

This order expresses no view regarding additional information about Defendants' communications with putative class members the parties may obtain through formal discovery or otherwise.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a protective order is granted as set forth above, and denied in all other respects.

**IT IS SO ORDERED.**

Dated: May 20, 2024

_____
JON S. TIGAR
United States District Judge